**AFFIRMED; Opinion Filed June 20, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-01212-CR

### LEONARD DARNELL WILLIAMS, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F-1263911-I**

# MEMORANDUM OPINION

Before Justices Lang, Lang-Miers, and Brown
Opinion by Justice Lang

Leonard Darnell Williams appeals his conviction for aggravated sexual assault of a disabled person. *See* TEX. PENAL CODE ANN. § 22.021 (West Supp. 2015). In a single issue, appellant contends the evidence is legally insufficient to support the conviction. We affirm the trial court's judgment. Because all dispositive issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.2, 47.4.

## I. FACTUAL AND PROCEDURAL CONTEXT

Appellant was indicted for aggravated sexual assault of K.P., a disabled individual. He challenges the sufficiency of the evidence in only one respect: he contends "[t]here was not sufficient evidence that appellant knew the victim could not consent because her mental

infirmities made her unable to appraise the nature of the situation or of resisting." We therefore limit our discussion to the evidence pertinent to appellant's complaint.

Appellant testified at both phases of the trial. During the guilt/innocence phase of the trial, appellant testified that he met K.P. in 2002, when she was about eight years old. He explained that K.P. lived with her mother and two siblings in the same apartment complex where appellant was living with a woman and her children. K.P. would "come over and play" with the children. In 2010, appellant and K.P.'s mother began dating, and moved in together. K.P. and her two siblings also lived with K.P.'s mother and appellant. Appellant testified that in 2012, when K.P. was seventeen, he had sexual intercourse with her four times.

Several witnesses testified to the extent of K.P.'s disability and its outward signs. Tamara Hines, an educational diagnostician with the Dallas Independent School District, testified she participated in an evaluation of K.P. when K.P. was in high school, in approximately the same time period as the alleged assaults. The purpose of the evaluation was "[t]o see if [K.P.] continued to exhibit the signs and symptoms of mental retardation and if those continued to affect her in an academic setting." Hines testified that in previous evaluations, K.P. had been diagnosed with mental retardation (later called "intellectual disability"). To receive this evaluation, K.P.'s I.Q. could not exceed 70; K.P.'s test result was an I.Q. of 59. Hines described the limitations caused by this disability:

> That means she needs help with a whole lot, a whole lot. Expressing herself, again, she's not able to tell you what she needs to convey her feelings, her emotions, what she knows. So she's been taught something previously and maybe she grasped it because of a lot of repetition, she can't tell you. She may not even be able to write it down. She's going to ultimately need help with her independent living. She'll never be able to live on her own. She could probably be productive in a group home or an assisted living facility. She'll need help with transportation, and there's a lot of safety issues and concerns with her because she's going to have difficulty—a lot of those kids, they don't know who's not good for them or who's bad for them. They love everybody. So it's kind of difficult for them to know who's safe and who's not. So that would be a huge concern.

–2–

Hines explained that K.P.'s I.Q. was not the only factor in the evaluations. Hines testified that K.P. also has "adaptive behavior issues" in socialization, communication, and in her daily living skills. K.P. was "extremely low" in the area of communication, "how well she is able to tell you what she knows or has been taught" and "what she understands." Hines explained that these "adaptive behaviors" are evaluated by interviewing an adult "who's known the child and has been able to observe them for at least six months." She agreed that "if someone had lived with [K.P.] for two years, then that would have qualified them to have also been interviewed about her adaptive behaviors."

Hines testified that she would be able to tell "just by looking at K.P. across a room that she was intellectually disabled." Also, K.P. has a speech impediment that Hines described as "a severe articulation disorder," meaning that "when she speaks, you can't really understand what she says." Hines explained, "[i]t's kind of like a baby when the baby is just learning to talk." Those around a baby "adjust to her speech," but those who are not familiar with the baby's "emerging speech" will not understand. Hines described K.P. as "very sweet," "very quiet," and "very shy."

On cross-examination, Hines testified that because K.P. "didn't need help with feeding herself or toileting," she was not placed in special education units for students who needed assistance in those areas. She said that K.P. was evaluated both in 2010 and 2013, and there was no change in the evaluations. She explained that K.P. had "global cognitive weaknesses" in all seven areas evaluated, including comprehension, long and short-term memory, verbal expression, processing speed, reasoning, and problem-solving abilities. Because of her memory problems, K.P. "has to have things done consistent[ly], taught consistently, repetitively, over and over again." Additionally, "[i]t's just going to take her a very long time to grasp what she sees or to process what she's seeing." According to Hines, K.P. would not be able to get on a DART

–3–

bus, go somewhere, and then come back on the bus by herself. Hines also testified to the following regarding the awareness of K.P.'s abilities by a person interacting with her:

> Q. Okay. Are you saying that someone who has an IQ of 70 or less, it would be—if one—if one had any interaction with them for, say, 5 to 10 minutes, they would know that something was wrong with them?
>
> A. Yes. Because they cannot interact at the same level that we do if you have average intelligence.

On redirect, Hines testified to her observation that K.P. "can't foresee the harm or the danger that might be presented to her in situations." Also, K.P. "absolutely cannot" handle money because "she has not mastered money concepts" such as paying bills, writing checks, using a debit card, receiving change from a purchase, or even understanding whether she has enough money to make a particular purchase.

Fallon Hawthorne, a special education instructional specialist, was K.P.'s case manager at school from 2011 to 2013. She communicated with K.P.'s mother and teachers to ensure that K.P.'s educational plan was properly implemented. Hawthorne testified that K.P. had been receiving special education services since she was six years old. She explained that K.P. could "copy"—that is, "writ[e] down what's already there"—but did not understand the concepts she copied. Classroom vocabulary had to be modified for K.P. "99 percent of the time" because of her limited comprehension; "what we're actually teaching in the classrooms or in textbooks, she wouldn't process that." K.P. was "performing at maybe a third grade level," and K.P.'s speech impediment was "severe."

Hawthorne testified that K.P. was "very trusting" of adults, and waited for adult help as "a safety net" to "guide [her] and lead [her] in the right direction." Adults "are like her safe havens." Because of her limited verbal expression K.P. had difficulty socializing even with students of similar cognitive function.

Hawthorne had contact with K.P.'s mother on a regular basis. She testified that K.P.'s sister was also intellectually disabled, and their mother "was in denial about where her kids were performing and where their disabilities were." Hawthorne attempted to connect the family with an agency to assist the girls after high school. K.P.'s mother, however, "specifically said her children wouldn't need this service because they were going to college." Hawthorne herself took the girls to doctors' appointments, helped the girls get prom dresses, drove the girls home from school, and drove their mother to the grocery store. She had to "step in" when K.P.'s mother would not, because K.P. "really isn't capable of doing those types of things for herself," such as scheduling a doctor's appointment. Hawthorne explained:

> Q. And so if something were to happen, [K.P.] would have no way to either get herself out of a harmful situation or even protect or defend herself; would that be fair?
>
> A. That is correct. She would not know how.
>
> Q. Okay. I guess, would it be fair to say that because of [K.P.'s] limitations, she's in an extremely vulnerable, just position in life to be taken advantage of and to be hurt?
>
> A. Yes. And if her mother or sister or grandmother befriends someone, then she'll feel comfortable with that person as well.

When asked whether a person living with K.P. should be able to recognize her disabilities, "and that she is more vulnerable and trusting and not able to care for herself the way the rest of us can," Hawthorne responded, "Yes. It is very evident."

Two other witnesses testified about their observations of K.P. The police officer who investigated the charges against appellant testified that K.P. "is a very slight 17-year-old female. She was mentally delayed. From talking with her, she seemed to function around about the age of 8- or 10-year-old to me." Robyn Horton, who dated K.P.'s brother, testified that K.P. was "difficult to understand" and "functions at a very low level." Horton was aware, from "being around the family," that K.P. was in special education classes at school. Horton testified that

appellant was living in the home with K.P. and her mother. K.P. initially told Horton that appellant had been touching her. Horton then contacted K.P.'s mother and grandmother, eventually leading to appellant's arrest.

K.P. herself testified. She described in very simple terms that appellant touched her "coochie" with his "dick" and that it made her feel "sad" when he did. She said it hurt her, and she told him not to do it. She eventually told "[m]y granny and my brother girlfriend," but not immediately because she was afraid that appellant would "want to hurt me," and because appellant asked her not to tell. K.P. explained:

Q. Okay. Did he ever ask you not to tell?

A. Yes.

Q. How did he do that?

A. He tell me pinky promise to not tell.

Q. He made you pinky promise not to tell?

A. Yes.

Q. What is a pinky promise? Can you show me?

A. (Nods head.)

Q. Okay. Show me what a pinky promise is.

A. He tell me like this (demonstrating), don't tell.

Q. Like this? Don't tell?

A. Yes.

Q. Okay. Did he do that every time he touched you?

A. Yes.

When asked how she felt about appellant, K.P. answered, "Sad. I don't like him no more."

Appellant testified that he knew K.P. was "disabled." He stated, "She was autism, yes." However, he testified that K.P. could catch a DART bus with a friend, and help her mother get her older sister, who had a similar disability, ready for school. Appellant testified that he was aware K.P. was in special education classes at school and she had a speech impediment. He believed she was mentally retarded, but "not as much as they say because there's different levels of autism." He testified that K.P. asked him to drive her to her boyfriend's home. Appellant said K.P. told him her boyfriend had texted her and wanted to have sex. K.P. asked several times, and appellant then asked "what you going to give me? She said, I ain't got no money. I said, you got you. And she said no, I can't do that with you because you go with my mother." Appellant testified he was "floored" by this response because he "didn't think [K.P.] would understand that much." Later, appellant said, K.P. "voluntarily" agreed to have sex with him. He testified it was K.P.'s idea to do the pinky swear, not his. Appellant testified they had consensual sex four times in K.P.'s home when K.P.'s mother was not there.

A jury found appellant guilty as alleged in the indictment. Appellant pleaded true to two enhancement paragraphs alleging prior felony convictions. The jury found the enhancement paragraphs true and assessed appellant's punishment at thirty-three years' confinement. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

### A. Applicable Law and Standard of Review

In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). We are required to defer to the jury's credibility and weight determinations because the jury is the sole

judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326.

A person commits the offense of aggravated sexual assault of a disabled individual if the person (1) intentionally or knowingly (2) caused the penetration of the anus or sexual organ of another person by any means (3) without the victim's consent, and (4) the victim is a disabled individual. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(i), (a)(2)(C). In a prosecution under section 22.021, the term "disabled individual" means "a person older than 13 years of age who by reason of age or physical or mental disease, defect, or injury is substantially unable to protect the person's self from harm or to provide food, shelter, or medical care for the person's self." *Id.* § 22.021(b)(3).[1] An aggravated sexual assault is without the consent of the other person if the aggravated sexual assault occurs under the same circumstances listed in section 22.011(b). *Id.* § 22.021(c). Section 22.011(b) provides in relevant part that a sexual assault is without consent of the other person if "the actor knows that as a result of mental disease or defect the other person is at the time of the sexual assault incapable either of appraising the nature of the act or of resisting it." *Id.* § 22.011(b)(4).

### B.    Application of Law to Facts

Appellant concedes there was sufficient evidence to support his conviction on all elements of the offense except K.P.'s lack of consent. He contends he did not know that "as a result of mental disease or defect," K.P. was "at the time of the sexual assault incapable either of appraising the nature of the act or of resisting it." *See* TEX. PENAL CODE ANN. § 22.011(b)(4). He relies on *Harris v. State*, 474 S.W.2d 706 (Tex. Crim. App. 1972), to support his argument.

---

[1] The indictment alleges that the offense occurred "[o]n or about and between the 13th day of May A.D., 2012 and the 1st day of June A.D., 2012." At that time, section 22.021 of the Penal Code did not include its own definition of "disabled individual." *See* Act of May 26, 2015, 84th Leg., R.S., ch. 784, § 1, 2015 TEX. GEN. LAWS 2430 (codified at TEX. PENAL CODE ANN. § 22.021). Instead, section 22.021 cross-referenced the definition of "disabled individual" in section 22.04(c) of the Penal Code. *See id.* The only substantive difference between section 22.04(c) as it read at the time of the offense and section 22.021(b)(3) quoted above is the minimum age of the disabled individual (reduced to 13 from 14 years of age), a difference not relevant to this appeal. *See* Act of May 29, 1993, 83rd Leg. R.S., ch. 900, § 1.01, 1993 TEX. GEN. LAWS 3622 (codified at TEX. PEN. CODE § 22.04). We therefore cite the current version of section 22.021(b)(3).

In *Harris*, a nineteen year old female ran up to the appellant's car while it was stopped at a railroad crossing, asked if she could go along, and then got into the car. *Id.* at 706. The appellant then drove the car to the spot where the alleged rape took place. *Id.* At trial, the State presented evidence that the victim's I.Q. was in the middle range of mental retardation, and that she could not function outside the state school where she lived without supervision. *Id.* at 707. However, there was also evidence that the victim "could give the appearance of being normal." *Id.* at 708. The court explained that even if the victim did not have the mental capacity to resist, "the statute also requires that the appellant knew it." *Id.* Because the evidence showed that the appellant had never seen the girl before she approached his car, and there was testimony that she could "appear normal for a time especially to someone with Harris' background and educational level," there was no evidence appellant knew she did not have the mental capacity to resist. *Id.*

Unlike the appellant in *Harris*, appellant had known K.P. since she was eight years old and had been living in the same home with her for approximately two years before the alleged assault. *See Sanchez v. State*, 479 S.W.2d 933, 941 (Tex. Crim. App. 1972) (evidence was sufficient to show appellant was aware of complainant's limited mental capacity when appellant knew complainant and her family, had lived in the same community for some time, and complainant was known in the community to be mentally impaired). Also, unlike *Harris*, there was no evidence that K.P. could "appear normal for a time." *See Harris*, 474 S.W.2d at 708. Instead, the only evidence presented to the jury demonstrated the severe limitations caused by K.P.'s disability. Each witness who interacted with K.P. for even a short time testified that her cognitive difficulties were evident.

Appellant admitted his awareness of K.P.'s cognitive limitations—in his words, her "autism"—but argues there is no evidence he knew her limitations were such that she was "incapable either of appraising the nature of the act or of resisting it," as penal code section

22.011(b)(4) requires. He correctly points out that neither Fallon nor Hines testified to any contact with him or any attempt to discuss K.P.'s disability with him. The jury, however, was able to observe K.P.'s demeanor and was the sole judge of both her credibility and appellant's. *See Jackson*, 443 U.S. at 326. As in *Martinez v. State*, "the jury was favored with firsthand observation of the [complainant] on the witness stand as she struggled to relate her version of the events." 634 S.W.2d 929, 935 (Tex. App.—San Antonio 1982, pet. ref'd). K.P.'s testimony revealed some of her cognitive limitations, such as her childlike descriptions of genitalia, her explanation of making a "pinky promise" to appellant not to tell, and expressing her feelings after rape as "sad." In *Martinez*, the court concluded, "[i]n view of all of the State's evidence amply demonstrating the [complainant's] manifestly obvious mental retardation, we find that the jury was entitled to believe that appellant knew that the [complainant] was so mentally defective as to be unable to appraise the act of intercourse or to resist it." *Id.* We reach the same conclusion here. From the evidence in the record, a rational factfinder could find beyond a reasonable doubt that appellant knew K.P. was "incapable either of appraising the nature of the act or of resisting it." *See See Jackson*, 443 U.S. at 319; TEX. PENAL CODE ANN. § 22.011(b)(4). Accordingly, we decide appellant's issue against him.

### III. CONCLUSION

We affirm the trial court's judgment.


/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
151212F.U05

–10–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LEONARD DARNELL WILLIAMS,
Appellant

No. 05-15-01212-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 2, Dallas County, Texas
Trial Court Cause No. F-1263911-I.
Opinion delivered by Justice Lang;
Justices Lang-Miers and Brown
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 20th day of June, 2016.